**Sarah PENCE et al.,
Plaintiffs-Appellants,**

**v.**

**Thomas S. KLEPPE, Individually and as Secretary of the Interior of the United States and his agents, and the United States of America, Defendants-Appellees.**

**No. 75–2144.**

United States Court of Appeals,
Ninth Circuit.

Jan. 16, 1976.

Rehearing Denied March 23, 1976.

<hr/>

**136**

Michael J. Frank and James Grandjean, Alaska Legal Services Corp., Anchorage, Alaska, for plaintiffs-appellants.

Carl Strass, Atty. and Wallace H. Johnson, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for defendants-appellees.

## OPINION

Before DUNIWAY, TRASK and SNEED, Circuit Judges.

DUNIWAY, Circuit Judge:

Plaintiffs-appellants are Native Alaskans claiming to be eligible for allotments of public lands under the Alaska Native Allotment Act (May 17, 1906, 34 Stat. 197, as amended Aug. 2, 1956, Ch. 891, 70 Stat. 954; 43 U.S.C. §§ 270–1— 270–3 (1970), repealed but with a saving clause for applications pending on December 18, 1971, by P.L. 92–203, Dec. 18, 1971, 85 Stat. 710, 43 U.S.C. § 1617). They claim to represent a class of 8,500 Native Alaskans as defined in the Act, that is, Indians, Aleuts, or Eskimos of full or mixed blood, residing in and native of Alaska who are heads of families or twenty-one years of age, and who have applied for allotments under the Act. Defendants are the Secretary of the Interior and the United States. The complaint alleges that the procedures of the Secretary in deciding whether to grant allotments deny the applicants due process, and demands an injunction requiring the Secretary to adopt and use procedures that will afford the applicants due process. On motion for summary judgment, the court entered a judgment dismissing the action on the ground that the granting or denial of allotments is so far committed to the Secretary's discretion as to put the matter beyond judicial review. *Pence v. Morton*, D.Alaska, 1975, 391 F.Supp. 1021. Plaintiffs appeal and we reverse and remand for further proceedings.[1]

1. *The statute and the procedures adopted by the Secretary.*

The Act authorized the Secretary "in his discretion and under such rules as he may prescribe" (§ 270–1) to allot up to 160 acres of vacant, unappropriated, and unreserved land in Alaska to any qualified Alaska Native. To qualify, the Native applicant must make "proof satisfactory to the Secretary . . . of substantially continuous use and occupancy of the land for a period of five years." (§ 270–3) The Secretary's regulations construe the Act to allow for customary and seasonal patterns of use and occupancy, but require that there must be actual possession and use, potentially exclusive of others, and not merely intermittent use. 43 C.F.R. § 2561.0–5(a). Thus, an applicant can meet the required qualifications by showing seasonal use of the claimed land, potentially exclusive of others, for five consecutive years for such customary purposes as hunting, fishing, or berry picking.

After the Bureau of Land Management, which acts for the Secretary, receives an application, a field examiner is sent out to the claimed land to seek and report on evidence of occupancy and the claimed use. The applicant, the appropriate village council, and the appropriate regional corporation are notified 30 days before the planned examination, and the applicant is invited to accompany the examiner.[2] If the applicant is not available, the village council or corporation is asked to appoint someone to accompany the examiner. If language barriers exist, interpreters are provided. Field examiners are to be instructed in native customs and land use patterns.[3] The examination is primarily accomplished by looking at the land from a low flying (10 to 30 feet) helicopter, al-

---

1. In its Memorandum and Order, the district court certified the class pursuant to F.R.Civ.P. 23(c)(1) and (b)(2). No question is raised before us as to the propriety of this certification.

2. This procedure is established by regulations issued on July 30, 1974. Many field examinations were performed before that date, and thus many applicants apparently did not have the opportunity to accompany the examiner.

3. Appellants, however, assert that they are prepared to demonstrate that this instruction has been insignificant or nonexistent in many cases, and in any case would not give the examiner any real appreciation of complex and ancient native land use patterns.

though if evidence of use is detected from the air the examiner may land and inspect more carefully.

After the examination, the examiner prepares a report describing any observed signs of use and occupancy and accompanies his findings with maps and photographs. A preliminary finding based on the report is then made and sent to the applicant. If the finding is negative, the applicant is given an additional period in which he may submit further evidence in writing. The Bureau of Land Management then issues a decision. If it is to reject, the applicant has 30 days in which to file a Notice of Appeal with the Department of the Interior's Board of Land Appeals. Within an additional 30 days, the applicant must file a written Statement of Reasons supporting the appeal. After the appeal is filed and the Statement of Reasons is submitted, the applicant may then request an oral factual hearing before an Administrative Law Judge. The decision to grant such a hearing is entirely within the discretion of the Board of Land Appeals.

Appellant-plaintiffs seek an order directing the Secretary to grant to applicants the right to a fair oral hearing before the rejection of an allotment application by the Bureau of Land Management. They allege jurisdiction under 25 U.S.C. § 345, 28 U.S.C. §§ 1353 (Indian allotments), 1331 (federal question), 1346(a)(2) (Tucker Act), 1361 (mandamus), and 2201–02 (declaratory judgment), and under 5 U.S.C. §§ 701–706 (Administrative Procedure Act). The district court dismissed the action for lack of jurisdiction.

## 2. Jurisdiction.

 Because we hold that the court had jurisdiction under 25 U.S.C. § 345 and 28 U.S.C. § 1353, we do not consider whether the court also had jurisdiction under any of the other statutes upon which plaintiffs rely. Title 25 U.S.C. § 345 provides, in pertinent part:

All persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any law of Congress, or who claim to be so entitled to land under any allotment Act . . . or who claim to have been unlawfully denied . . . any allotment . . . of land to which they claim to be lawfully entitled by virtue of any Act of Congress, may commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto in the proper district court of the United States; and said district courts are given jurisdiction to try and determine any action . . . involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty (and in said suit the parties thereto shall be the claimant as plaintiff and the United States as party defendant); and the judgment or decree of any such court in favor of any claimant to an allotment of land shall have the same effect, when properly certified to the Secretary of the Interior, as if such allotment had been allowed and approved by him . . . .[4]

On its face, this statute is a grant of general jurisdiction to United States District Courts in actions such as this one, and a waiver of sovereign immunity by the United States.[5] See also § 346,

4. Title 28 U.S.C. § 1353 "is a recodification of the jurisdictional portion of § 345." *Scholder v. United States*, 9 Cir., 1970, 428 F.2d 1123, 1126 n. 2.

5. The Secretary does not argue that Alaska Natives who are of "Aleut" or "Eskimo" rather than "Indian" blood cannot bring actions under § 345 and § 1353, because those sections refer only to persons of "Indian blood or descent." We would not accept the argument

if it were made. We consider it because jurisdiction usually cannot be conferred on a federal court by consent. Section 345 refers to "any allotment Act or . . . any grant made by Congress." The Alaska Native Allotment Act fits this language, and it deals with allotments to Indians, Aleuts and Eskimos without making any distinction between them. There are many statutes dealing specifically with Alaska, such as the Alaska Native Allotment Act, which refer expressly to Indians,

which provides for service of process on the United States and the duty of the United States Attorney to represent it in the action, and see *Heckman v. United States*, 1912, 224 U.S. 413, 441–442, 32 S.Ct. 424, 56 L.Ed. 820; *McKay v. Kalyton*, 1907, 204 U.S. 458, 468–69, 27 S.Ct. 346, 51 L.Ed. 566. We need not here decide whether § 345 is limited to "suits to compel the making of allotments in the first instance" (*United States v. Eastman*, 9 Cir., 1941, 118 F.2d 421, 423; *United States v. Preston*, 9 Cir., 1965, 352 F.2d 352, 358). This is just such an action, and it is clear that § 345 does permit it. In *United States v. Pierce*, 9 Cir., 1956, 235 F.2d 885, *Arenas v. Preston*, 9 Cir., 1950, 181 F.2d 62, and *Gerard v. United States*, 9 Cir., 1948, 167 F.2d 951, we gave to § 345 a more liberal construction. Certain it is, under all of the cited cases, that § 345 both confers jurisdiction on the district courts in cases such as this and waives the sovereign immunity of the United States in such cases.

■■■■ The district court was mistaken in tying the jurisdictional grant of 25 U.S.C. § 345 and 28 U.S.C. § 1353 to the Administrative Procedure Act, 5 U.S.C. § 701(a)(2). The district court relied entirely on the case of *Pallin v. United States*, 9 Cir., 1974, 496 F.2d 27, apparently believing that *Pallin* held that jurisdiction existed only if in fact the plaintiff had a right to an allotment, and that because the Allotment Act commits the decision to agency discretion, there is no jurisdiction. This is an incorrect interpretation of both *Pallin* and § 345.

*Pallin* was an action between a brother and a sister over the allotment of a 160-acre tract of land. The sister, however, also challenged the Secretary's classification of the land as half "nonirrigable agricultural" and half "nonirrigable grazing." The trial court found in her favor on both issues. On appeal, we held that the trial court had jurisdiction under § 345 to determine the dispute between the brother and sister, because that dispute arose out of the General Allotment Act of 1887. However, we also held the trial court did not have jurisdiction to decide the classification issue because that question involved the Secretary's right to classify federal lands under the Taylor Grazing Act, 43 U.S.C. § 315f, and thus it did not fall under the § 345 jurisdictional grant in cases involving allotment statutes. Therefore, because the classification question did not fall under § 345, jurisdiction must arise under the Administrative Procedure Act, which excludes matters entrusted by law to agency discretion from review.

The district court in the present case confused these two distinct holdings. We held in *Pallin* "that in an action brought by an Indian under 25 U.S.C. § 345 and 28 U.S.C. § 1353, Congress has given to the District Court original jurisdiction to determine whether, in actions involving the right to an allotment . . . the Secretary acted within the limits Congress has placed on him." 496 F.2d at 32. *See also Hopkins v. United States*, 9 Cir., 1969, 414 F.2d 464, 466. The fact that in *Pallin* we also held that questions involving classifications of lands under the Taylor Grazing Act were

Aleuts, and Eskimos. On the other hand, many other statutes which are of general application throughout the United States and its territories refer only to "Indians." It has been held that in those statutes, the word "Indian," as applied in Alaska, includes Aleuts and Eskimos. The Act of June 2, 1924, Public No. 175, 43 Stat. Ch. 233, p. 253, confers citizenship on "all non-citizen Indians." In *Hynes v. Grimes Packing Co.*, 9 Cir., 1948, 165 F.2d 323, 326, we said that the statute conferred citizenship upon the Eskimo of Alaska. The Act of August 13, 1946, Pub.L. 726, 60 Stat. Ch. 959, p. 1049, 25 U.S.C. §§ 70–70v, created the Indian Claims Commission and granted it jurisdiction

of claims "on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska." (§ 2, 25 U.S.C. § 70a). In *United States v. The Native Village of Unalakleet*, 1969, 411 F.2d 1255, 188 Ct.Cl. 1, the Court of Claims, in an exhaustive opinion, held that the word "Indian" as used in the statute, included Eskimos and Aleuts. The court pointed out that the word "Indian" is commonly used in this country to mean "the aborigines of America." See also 42 C.J.S. Indians § 1, p. 647. We agree, and hold that such is its meaning in 25 U.S.C. § 345 and 28 U.S.C. § 1353.

not subjected to the jurisdiction of the courts under § 345 has no bearing on the instant case.

We know of no authority for the notion that the Administrative Procedure Act, and particularly 5 U.S.C. § 701(a)(2), is a limitation upon the jurisdiction conferred upon the district courts by other statutes such as § 345 and § 1353. Section 701(a)(2) is, by its terms, merely an exception to the applicability of the Administrative Procedure Act itself, and nothing more.

The Congress can, if it chooses, commit a matter to executive discretion and at the same time provide for judicial review of the exercise of that discretion. That is what § 345 and § 1353 do. *See Arenas v. United States,* 1944, 322 U.S. 419, 429–34, 64 S.Ct. 1090, 88 L.Ed. 1363. We think it particularly significant that § 345 permits the court to enter a judgment awarding an allotment which "shall have the same effect . . . as if such allotment had been allowed and approved by" the Secretary.

### 3. *The relief sought.*

The plaintiffs seek a judgment requiring the Secretary to afford them a "due process" type of hearing before initially denying any application for an allotment. The trial court, however, because the Allotment Act commits the granting of allotments to the discretion of the Secretary, held that the plaintiff did not have a sufficient expectation of or entitlement to allotments to require due process protection. In this, too, we think that the court was in error.

The history of the Alaska Native Allotment Act indicates that the Congress did not intend to give unfettered discretion to the Secretary, discretion so broad that there is no law to apply. *Cf. Citizens to Preserve Overton Park v. Volpe,* 1971, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136. We are persuaded that Congress saw the Act as a means of granting to the Alaska Natives land to which, on compliance with certain conditions, they would become entitled. In 1887, Congress passed the General Allot-

ment Act, 25 U.S.C. § 334, which provided that any "Indian" not on a reservation who "settles" land under the statutory requirements "shall be entitled" to an allotment of that land. The language of that statute, as the Secretary admits, gave the Indians an entitlement to the land and did not give complete discretion to the Secretary. However, because a number of lower courts found that Alaska Natives were not within the definition of "Indian," there was doubt whether the General Allotment Act did apply to them. Thus Congress moved in 1906 to eliminate this doubt by passing the Alaska Native Allotment Act.

■ That Act does provide law that can be applied; it defines the types of land available for allotment and it sets requirements that an applicant must meet in order to qualify. Further, there is no evidence of legislative intent to cut off judicial review. On the contrary, because all indications are that the 1906 Act merely plugged a supposed hole in the coverage of the nondiscretionary 1887 Act, the opposite should be inferred. Finally, to allow judicial review comports with this court's position that "statutes passed for the benefit of dependent Indian tribes and communities are to be liberally construed in favor of the Indians." *Rockbridge v. Lincoln,* 9 Cir., 1971, 449 F.2d 567, 571. In *Rockbridge,* we concluded that:

[a] permissive statutory term . . . is not by itself to be read as a congressional command precluding judicial review. The question is whether nonreviewability can fairly be inferred from the over-all statutory scheme. *Id.* at 570.

■ In concluding that, because of the discretion conferred on the Secretary by the Act, the plaintiff had no protectable property interest under the due process guarantee of the Fifth Amendment, the district court relied on *United States v. Walker,* 9 Cir., 1969, 409 F.2d 477. *Walker* held that a claimant to land under a mining claim statute could not get judicial review of the Secretary's decision because the discretionary wording

of the statute made his claim to the mineral land a "privilege," not a "right" worthy of constitutional protection. *Id.* at 481. It may be doubted that *Walker* is still good law. The "rights-privileges" dichotomy has been repudiated. At most, it is but one factor to be considered. *East Oakland-Fruitvale Planning Council v. Rumsfeld,* 9 Cir., 1972, 471 F.2d 524, 532 n. 7. Three years after *Walker,* the Supreme Court, in *Board of Regents v. Roth,* 1972, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, said that "the Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights." *Id.* at 571, 92 S.Ct. at 2706. Instead, the Court has adopted the test of whether the person claiming a violation of due process had a sufficient "property interest" in the government benefit denied by the agency. We hold that the Native applicants here have a sufficient property interest to warrant due process protection.

The test for identifying a sufficient property interest is not clearly defined. The Supreme Court capsulized the meaning of the term in *Roth* by noting that:

> [c]ertain attributes of "property" interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.

408 U.S. at 577, 92 S.Ct. at 2709.

We hold that Alaska Natives who occupy and use land for at least five years, in the manner specified in the Act and the regulations, rely on their continued right to that land at least as much as welfare recipients rely on continued welfare benefits, *see Goldberg v. Kelley,* 1970, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287, or as unemployed persons rely on unemployment compensation, *see Sherbert v. Verner,* 1963, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965, or as any citizen relies on a tax exemption, *see Speiser v. Randall,* 1958, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460, or as a school child relies on not being suspended, *see Goss v. Lopez,* 1975, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725.

Our holding is fortified by legislative history. In the Report to the Full House of Representatives from the Committee on Public Lands which reported out the Alaska Native Allotment Act, the Committee said:

> The necessity for this legislation arises from the fact that Indians in Alaska are not confined to reservations as they are in the several States and Territories of the United States, but they live in villages and small settlements along the streams where they have their little homes upon land to which they have no title, nor can they obtain title under existing laws. It does not signify that because an Alaska Indian has lived for many years in the same hut and reared a family there that he is to continue in peaceable possession of what he has always regarded his home. Some one who regards that particular spot as a desirable location for a home can file upon it for a homestead, and the Indian or Eskimo, as the case may be, is forced to move and give way to his white brother. This has in some instances already worked severe hardship upon these friendly and inoffensive natives to the shame of our own race, due more to a lack of needed legislation than to wanton disposition on the part of those who have thus dispossessed them than it has been to deprive the natives of *what must be conceded to be their rights.* [emphasis added] H.R.Rep. No. 3295, 59th Cong., 1st Sess. (1906).

This is a clear indication that Congress intended to create or to recognize rights in Alaska Natives to the land that they occupy for the statutory period, and not, as the Secretary contends, merely a hope

that the government will give them the land. An Alaska Native who meets the statutory requirements on land statutorily permitted to be allotted is entitled to an allotment of that land, and the Secretary may not arbitrarily deny such an applicant. Due process does apply.

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 1972, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484. "We turn to that question, fully realizing as our cases regularly do that the interpretation and application of the Due Process Clause are intensely practical matters and that 'the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" [citation omitted] *Goss v. Lopez*, 1975, 419 U.S. 565, 577–78, 95 S.Ct. 729, 738, 42 L.Ed.2d 725. "The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,' [citation omitted] and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication." *Goldberg v. Kelley*, 1970, 397 U.S. 254, 263, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287. Thus, procedures must be provided to the extent that the benefit of avoiding unwarranted rejections of allotment applications is not outweighed by the administrative burden on the government.

The Secretary contends that the current procedures used do meet the requirements of due process. He reasons that because an applicant may accompany the field examiner and the examiner is instructed in the customs and patterns of Native land use, the present on-sight inspection procedure is the best way to uncover the truth. We agree that the procedure is useful, but do not agree that it provides the due process that is required.

Long ago, the Supreme Court said: "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Baldwin v. Hale*, 1863, 68 U.S. 223, 233, 1 Wall. 223, 17 L.Ed. 531. Thus, the Alaska Native applicants whose applications the Secretary intends to reject must be given *some* kind of notice and *some* kind of hearing before the rejection occurs. Notice requires that they be told the specific reasons for the proposed rejection so that they may be able to properly counter those reasons. Hearing requires that they be allowed to present to the ultimate decision-maker evidence which supports the application. Merely being allowed to communicate with the field examiner does not meet this requirement.

Even if every applicant were allowed to accompany the examiner and every examiner were adequately instructed, matters which are in dispute, the field examiner is not the decision-maker; he is a mere gatherer and conveyor of information, and possibly a recommender. As the Supreme Court held in *Goldberg v. Kelley*, requiring a hearing before termination of welfare benefits: "[t]he second-hand presentation to the decision-maker by the caseworker has its own deficiencies; since the caseworker usually gathers the facts upon which the charge of ineligibility rests, the presentation of the recipient's side of the controversy cannot safely be left to him." 397 U.S. at 269, 90 S.Ct. at 1021. Similarly, when an allotment application has been rejected, it will almost always be because of the adverse findings of the examiner; the presentation of the applicant's side of the controversy cannot safely be left to him.

Likewise, merely allowing the applicant to submit written evidence is inadequate. "Written submissions are an unrealistic option for most recipients, who lack the educational attainment necessary to write effectively and who cannot obtain professional assistance," *Goldberg v. Kelley*, 1970, 397 U.S. at 269, 90 S.Ct. at 1021, and there is ample evidence to support the position that Alaska Natives are even less educated and literate than most American welfare recipients. *See Alvarado v. State*, 1971, 486 P.2d 891,

900 (Alaska). Written documents do not allow the trier of fact to assess the demeanor and attitude of the various witnesses and thereby test their credibility. Finally, written evidence cannot be drawn so as to allow the applicant to frame his argument in a manner that stresses points that appear to be important to the decision-maker. In sum, written testimony is inadequate to satisfy due process when it involves a right as important as the right to be allotted land under the Act.

■ Thus, at a minimum, applicants whose claims are to be rejected must be notified of the specific reasons for the proposed rejection, allowed to submit written evidence to the contrary, and, if they request, granted an opportunity for an oral hearing before the trier of fact where evidence and testimony of favorable witnesses may be submitted before a decision is reached to reject an application for an allotment. Beyond this bare minimum, it is difficult to determine exactly what procedures would best meet the requirements of due process. The specific problems involved and the demands placed upon the Bureau of Land Management are best judged initially by the Secretary. It is up to the Secretary, in the first instance, to develop regulations which provide for the required procedures, subject to review by the district court and, if necessary, by this court.

■■ The Secretary finally contends that the plaintiffs-appellants should be denied review because their failure to ask the Board of Land Appeals to grant them a hearing is a failure to exhaust administrative remedies. However, for a number of reasons the district court found this contention to be without merit. 391 F.Supp. at 1024 n. 3. For the same reasons, we agree with that finding.

The judgment is reversed and the case is remanded to the district court for further proceedings consistent with this opinion.