UNITED STATES of America,
Plaintiff–Appellee,

v.

Daniel Peter KANEHOLANI,
Defendant–Appellant.

Crim. No. 89–00571 DAE.

United States District Court,
D. Hawaii.

Dec. 11, 1990.

Daniel A. Bent, U.S. Atty., John F. Peyton, Jr. and Lawrence L. Tong, Asst. U.S. Attys., Honolulu, Hawaii, for plaintiff-appellee.

Hayden Aluli, Asst. Federal Public Defender, Federal Public Defenders Office, Honolulu, Hawaii, for defendant-appellant.

## ORDER AFFIRMING MAGISTRATE'S DENIAL OF DEFENDANT'S MOTION TO DISMISS INFORMATION AND TO SUPPRESS EVIDENCE

DAVID A. EZRA, District Judge.

Defendant Daniel Peter Kaneholani ("Kaneholani") appeals the magistrate's denial of his pre-trial motions to dismiss the information and to suppress evidence. After denial of his pre-trial motions, Kaneholani pled guilty to violation of 16 U.S.C. § 1538(a)(1)(B) and (G) and 50 C.F.R. § 222.21 for taking and possessing parts of a Hawaiian monk seal. Kaneholani re-

served his right to appeal the denial of his pretrial motions. He was sentenced to one year of incarceration and one year of supervised release.

Kaneholani appeals the magistrate's denial of his motions on four grounds: (1) the Endangered Species Act ("Act") does not prohibit the taking or possession of a Hawaiian monk seal by a native Hawaiian; (2) the Act's exception for native Alaskans is a violation of equal protection; (3) the magistrate committed reversible error in failing to order the government to produce Jencks Act statements made by witness Gene Witham ("Witham"); and (4) the magistrate committed reversible error by failing to require the government to produce *Brady* materials.

### A. *Standard of Review*

■ After conviction, matters of law are reviewed *de novo*. *United States v. Arrellando*, 812 F.2d 1209 (9th Cir.1987); *United States v. Miller*, 771 F.2d 1219 (9th Cir.1985). The court reviews the constitutionality of statutes *de novo*. *FTC v. American Nat'l Cellular, Inc.*, 810 F.2d 1511 (9th Cir.1987); *Miller*, 771 F.2d at 1225.

■ Jencks Act determinations are reviewed for an abuse of discretion. *United States v. Moody*, 778 F.2d 1380, 1383 (9th Cir.1985) (citations omitted). Failure to produce Jencks Act material does not require automatic reversal; instead, a harmless error test must be applied. *United States v. Beasley*, 576 F.2d 626, 629 (5th Cir.1978), *cert. denied* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979).

Since courts cannot "speculate whether [Jencks material] could have been utilized effectively" at trial, ... the harmless-error doctrine must be strictly applied in Jencks Act cases.

*Goldberg v. United States*, 425 U.S. 94, 111 n. 21, 96 S.Ct. 1338, 1348 n. 21, 47 L.Ed.2d 603 (1976) (citations omitted).

■ Nor does failure to produce *Brady* material require a new trial unless it can be shown that there was a reasonable possibility that the suppressed evidence would

have materially affected the verdict. *United States v. Lehman*, 792 F.2d 899, 901 (9th Cir.1986); *United States v. Dupuy*, 760 F.2d 1492, 1501 n. 3 (9th Cir.1985). Such questions are reviewed *de novo*. *Lehman*, 792 F.2d at 901.

**B.** *The Endangered Species Act Prohibits Kaneholani From Taking a Monk Seal*

Title 16 U.S.C. § 1533(a)(1) authorizes the Secretary of the Interior to list species as either "endangered" or "threatened." If a species is "endangered," the Act prohibits "any person subject to the jurisdiction of the United States" from importing, exporting, taking, possessing, selling, offering for sale, delivering, carrying, transporting, or shipping such species. *See* 16 U.S.C. § 1538(a)(1)(A)–(F). Title 16 § 1540(b) provides criminal penalties for violations of the Act.

Kaneholani claims that he hunts monk seals for subsistence purposes and that therefore he, as a native Hawaiian, has an "aboriginal right" to continue this practice. He argues that there is a trust relationship between native Hawaiians and the federal government, and that based on this trust relationship, the federal government may not abrogate aboriginal rights absent "clear and plain" intent. Finally, Kaneholani argues that the Act does not express a "clear and plain" intent to abrogate these rights.

Kaneholani contends that because there is a legally recognized trust relationship between the federal government and American Indians, there should likewise be a trust relationship between the federal government and native Hawaiians. He cites *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831), in which Justice Marshall described American Indian tribes as "domestic dependent nations [whose] relation to the United States resembles that of a ward to his guardian." Kaneholani suggests there is no reason to distinguish between American Indian tribes and native Hawaiians because "both groups saw their governments collapse and their lands taken away in the heyday of nineteenth century American imperialism." Appellant's Brief at 8.

Kaneholani also cites *United States v. Dion*, in which the United States Supreme Court recognized the right of the Yankton Sioux Tribe to shoot and hunt bald eagles but held that right had been abrogated by the Bald Eagle Protection Act. 476 U.S. 734, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1985). Kaneholani attempts to draw a parallel between his own situation and that of the Yankton Sioux Tribe. He claims that he, like the Sioux, has an "aboriginal" right to hunt an endangered species, a right that can only be abrogated by the "clear and plain intent" of Congress.

Kaneholani's argument lacks merit because he fails to recognize that the Yankton Sioux Tribe in *Dion* had a *treaty* right to hunt bald eagles. "[M]embers of the Yankton Sioux Tribe have a *treaty* right to hunt bald and golden eagles within the Yankton Reservation for noncommercial purposes." [1] 476 U.S. at 736, 106 S.Ct. at 2218–19. It was the conflict between this *treaty* right and the Bald Eagle Protection Act that the court addressed in *Dion*. Absent an explicit treaty or statutory right to take monk seals, Kaneholani can point to no legally recognized "aboriginal right" to take monk seals. [2]

If Congress had intended to grant native Hawaiians an exception to the Act to permit the taking of monk seals, it would have passed a statute specifically granting this right. [3] This court has no power to fashion

1. In fact, Dion did *not* challenge his convictions for hunting bald eagles for *commercial* purposes and for *selling* bald eagles because these rights were *not* included in the treaty. 476 U.S. at 735 n. 1, 736 n. 2, 106 S.Ct. at 2218 n. 1, 2219 n. 2.

2. Kaneholani devotes a portion of his brief to the Hawaiian Homes Commission Act, 42 Stat. 108, § 203(5) (1920), and argues that this statute created a *de facto* "Indian reservation" for native Hawaiians. This argument is irrelevant in light of the fact that native Hawaiians have no treaty rights to hunt monk seals.

3. *See, e.g.,* 16 U.S.C. § 1539, granting an exception to the Act for native Alaskans to take "any endangered species or threatened species … if such taking is primarily for subsistence purposes."

such a statute where none exists. Such action would be a violation of the separation of powers doctrine. "[T]he authority to construe a statute is fundamentally different from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt." *Northwest Airlines, Inc. v. Transport Workers Union of America, AFL–CIO,* 451 U.S. 77, 97, 101 S.Ct. 1571, 1583, 67 L.Ed.2d 750 (1981).

Kaneholani next argues that native Hawaiians should be considered "American Indians" and cites *Pence v. Kleppe* and *United States v. Native Village of Unalakleet* in support of this argument. *See* Appellant's Brief at 8. The court in *Pence* held that the word "Indians" as used in Alaskan land allotment statutes included Indians, Aleuts and Eskimos. 529 F.2d 135 (9th Cir.1976). The court in *Unalakleet* held that the term "American Indian" as used in the Indian Claims Commission Act included Eskimos and Aleuts. 411 F.2d 1255, 188 Ct.Cl. 1 (Ct.Cl.1969). In the present case, Kaneholani cites no *statute* granting "American Indians" the right to take monk seals. As discussed below, the Act provides an exception for "Alaska natives." To construe "Alaska natives" to include "native Hawaiians," however, goes far beyond the interpretations engaged in by the *Pence* and *Unalakleet* courts and would amount to judicial legislation.

Finally, the court notes that the Act prohibits "any person subject to the jurisdiction of the United States" from taking an endangered species. Kaneholani does not contest that he is "subject to the jurisdiction of the United States." Hence, Kaneholani clearly falls within the proscriptions of the statute.[4]

## C. *The Exception for Native Alaskans Does Not Violate Equal Protection*

The Act exempts "Alaska natives" from its prohibitions. *See* 16 U.S.C. § 1539(e).

Kaneholani contends that Congress' failure to include native Hawaiians in this exemption is a violation of equal protection.

Title 16 U.S.C. § 1539(e)(1) provides:

[T]he provisions of this chapter shall not apply with respect to the taking of any endangered species or threatened species ... by ... any Indian, Aleut, or Eskimo who is an Alaskan Native who resides in Alaska; or any non-native permanent resident of an Alaskan native village ... *if such taking is primarily for subsistence purposes.*

(Emphasis added.) Kaneholani argues that native Alaskans and native Hawaiians are "similarly circumstanced" and therefore they should be treated alike under the statute. Kaneholani states that "both are indigenous people of the United States" and that "[b]oth surrendered vast amounts of land and the right of self-determination upon American annexation." Appellant's Brief at 15.

The similarities cited by Kaneholani are not the similarities that would be relevant to an exception to the Act. Congress provided the exception for native Alaskans because they depend upon hunting certain endangered species for subsistence purposes. In fact, the exception is not unlimited; the Secretary of the Interior may impose restrictions upon native Alaskans if he determines that the takings would "materially and negatively affect ... the threatened or endangered species." 16 U.S.C. § 1539(e)(4).

Kaneholani has made no showing that native Hawaiians, as a group, depend upon the hunting of monk seals for subsistence. Kaneholani merely claims that because the monk seal was "afterwards used for food," it was taken for subsistence purposes.[5] The fact that Kaneholani planned to eat the

---

**4.** Kaneholani argues that Congress' intention to abrogate his "right" to take monk seals must be "clear and plain." He cites *Dion,* which held that Congress' intention to abrogate Indian treaty rights must be clear and plain. Because no *treaty rights* are involved here, Kaneholani's reliance on *Dion* is misplaced.

**5.** Kaneholani also claims that he personally "made his living as a subsistence hunter and fisherman gathering from the valleys and oceans." Appellant's Brief at 2. If the court were to be persuaded by this assertion, then any individual who violated the Act could escape punishment by making the same claim.

monk seal, or even that he personally made his living killing monk seals in violation of the Act, does not equate to a showing that native Hawaiians depend on the monk seal for subsistence. In fact, Congress based its decision to provide an exception for native Alaskans on an explicit finding that they "depend on traditional hunting practices not only for subsistence but as a means for preserving social unity." S.Rep. No. 307, 93rd Congress, 1st Sess. 5, *reprinted in* 1973 U.S. Code Cong. A.D. News 2989, 2993.

■ The exception provided in 16 U.S.C. § 1539 withstands scrutiny under the "rational basis" test. In *Washington v. Confederated Bands and Tribes*, the United States Supreme Court held that federal legislation singling out tribal Indians would be reviewed for an equal protection violation under the "rational basis" test. 439 U.S. 463, 500–01, 99 S.Ct. 740, 761, 58 L.Ed.2d 740 (1979).[6] "It is settled that 'the unique legal status of Indian tribes under federal law' permits the Federal Government to enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive." 439 U.S. at 500–01, 99 S.Ct. at 761, *quoting Morton v. Mancari,* 417 U.S. 535, 551–52, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). The exception involved in the present case is legislation "singling out tribal Indians" to the extent that it provides an exception for "any Indian, Aleut, or Eskimo who is an Alaskan Native."

In order to satisfy the "rational basis" test, all that is required is some reasonably conceivable statement of facts that would justify the classification. *Hoffman v. United States,* 767 F.2d 1431, 1436–37 (9th Cir.1985). Reviewing courts should " 'seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.' " *Id.* at 1436, *quoting Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982).

This test is satisfied in the present case. It was rational for Congress to conclude that, in general, native Alaskans rely on certain endangered or threatened species for subsistence purposes, whereas, in general, native Hawaiians do not. While some native Hawaiians may choose to isolate themselves from the conveniences of modern society, most native Hawaiians do not live in areas so remote that access to conventional food supplies is virtually nonexistent. There has never been a showing, either by Kaneholani in his appeal brief or by any other individual on behalf of native Hawaiians, that native Hawaiians as a group rely on the monk seal for subsistence purposes.

The court notes that in compliance with the Administrative Procedure Act, 5 U.S.C. § 553(b), the National Marine Fisheries Service ("NMFS") published in the Federal Register its intent to add the Hawaiian monk seal to the list of endangered species. In addition, a letter was sent in August of 1976 from Robert W. Schoning, Director of the NMFS, to then Hawaii Governor George R. Ariyoshi to "formally invite Hawaii's comments and recommendations for consideration in what final action should be taken." The Governor responded:

> [W]e have no objection to the proposal. We feel that listing of the Hawaiian monk seal as an endangered species throughout its range in the Northwestern Hawaiian Islands will assure that its management will focus on perpetuating a viable population.

Letter dated September 27, 1976, from George R. Ariyoshi to Robert W. Schoning, Director of NMFS. At no time was a request made to exempt native Hawaiians from the prohibition.

Section 1539(e) also provides an exception for "any non-native permanent resident of an Alaskan native village...." This prong of the exception does not "single out tribal Indians." The "rational basis" test still applies to this prong of the

---

**6.** The legislation at issue in *Confederated Bands* was a Washington state statute enacted "in response to a federal measure explicitly designed to readjust the allocation of jurisdiction over Indians." 439 U.S. at 501, 99 S.Ct. at 761.

Therefore, the court applies the rational basis standard to the state legislation, even though states "do not enjoy [the] same unique relationship with Indians" as the federal government does. *Id.*

exception, however, because it does not classify on the basis of race, ancestry, or alienage. *Hoffman*, 767 F.2d at 1434–35 (in cases not involving a suspect classification or a fundamental right, the rational basis standard applies). This prong provides that *any* non-native permanent resident of an Alaskan native village, of *any* race, will fall under the subsistence exception.[7] For the reasons discussed above, this prong of the exception similarly satisfies the rational basis test.[8]

### D. *The Magistrate Did Not Commit Reversible Error in Failing to Order the Government to Produce Jencks Act Statements*

The Jencks Act requires that in a criminal prosecution, after a witness has been called by the United States and has testified on direct examination, the court upon motion of the defendant shall order the United States to produce any other statement of that witness that relates to the subject matter of his testimony. 18 U.S.C. § 3500(b). Under subsection (e)(2) of the Act, a stenographic, mechanical, electrical, or other recording, or a transcription thereof, is considered a "statement" of the witness if it is a "substantially verbatim" recital of an oral statement of the witness and is recorded contemporaneously with the uttering of such statement. *See also Campbell v. United States*, 365 U.S. 85, 93–95, 81 S.Ct. 421, 425–427, 5 L.Ed.2d 428 (1961); *United States v. Harris*, 543 F.2d 1247, 1250 (9th Cir.1976); *Ogden v. United States*, 303 F.2d 724, 735 (9th Cir.1962).

▮ Reports that do not contain substantially verbatim statements of the witness are not producible. *Ogden*, 303 F.2d at 735. This approach balances the two purposes of the Act, which are to make available to the defendant certain materials in the possession of the government which could be used in impeachment while at the same time protecting government files from unwarranted disclosure. *United States v. Rewald*, 889 F.2d 836, 866 (9th Cir.1988); *citing Ogden*, 303 F.2d at 732–33.

It is up to the court to determine which statements in the government's files are substantially verbatim. *Rewald*, 889 F.2d at 867. The court makes this determination by way of an *in camera* inspection, and its decision is reversible only if "clearly erroneous." *United States v. Edwards*, 702 F.2d 529, 531 (5th Cir.1983); *Dupuy*, 760 F.2d at 1497.

Federal Rule of Criminal Procedure ("Rule") 12(i) provides that even if called by a defendant, a law enforcement officer shall be deemed a witness called by the government. In the present case, Witham, lead investigative agent for the government, was called by Kaneholani's counsel at the hearing on Kaneholani's motion to dismiss and to suppress evidence. The government does not dispute that for purposes of Jencks Act analysis, Witham should be considered a government witness.[9]

The government denies that Witham prepared any reports relating to his testimony at the suppression hearing.[10] Nor does defendant suggest that he has any reason to believe that such documents exist. Instead, defendant makes the bald assertion:

---

**7.** Thus, if Kaneholani were a permanent resident of an Alaskan native village, he would fall under this exception.

**8.** The court notes that even if the strict scrutiny standard were applied, the legislation would withstand an equal protection challenge. The exception for native Alaskans is extremely narrowly tailored. It provides an exception *only* where a taking is for "subsistence purposes." Further, as noted above, the Secretary has the authority to impose further restrictions when, in his opinion, "such taking[s] materially and negatively affect ... the threatened or endan-

gered species." Finally, any taking under this exception "may not be accomplished in a wasteful manner." 16 U.S.C. § 1539(e)(2).

**9.** "The issue before this Court is not whether agents' reports *can* be subjected to Jencks Act production (they can) or whether Rule 12(i), Fed.R.Crim.P., requires production of Jencks Act statements made by government agents who are called by the defendant during pretrial motions (it does)." Appellee's Brief at 21.

**10.** "The bottom line is that no statements exist." Appellee's Brief at 25.

It was obvious that Witham had prepared reports. He was the lead investigative agent.

Appellant's Brief at 18.

The court notes that at no time during the examination of Witham did defense counsel ask him if he had prepared any written reports regarding the subject matter of his testimony. The court also notes that after denying the defendant's motion to suppress, the magistrate expressly offered the defendant an opportunity to renew his motion and to recall Witham, at which time defense counsel could reiterate his demand for Jencks Act material. Defendant failed to renew his motion.

■ In light of the government's good faith representation to this court and to the magistrate that no written report was prepared by Witham covering the subject matter of his testimony, the court finds that the magistrate did not commit reversible error in failing to "require" the government to produce documents that allegedly do not exist.

E. *The Magistrate Did Not Commit Reversible Error in Failing to Order the Government to Produce Brady Material*

Kaneholani bases his *Brady* claim on the reports of state conservation officers Ishikawa and Koerte, which defense counsel obtained after the suppression hearing. Kaneholani claims that had these reports been available at the hearing, he would have been able to argue that the monk seal was obtained by a government agent in violation of his fourth amendment rights.

The monk seal was kept by Kaneholani in the freezer of Evelyn Reis ("Reis"), Kaneholani's girlfriend's mother. Samuel Kaleiohi ("Kaleiohi"), Reis' brother, provided the monk seal to the government. At the suppression hearing, Kaleiohi denied having been asked by a government agent to provide the seal meat to the government.

Ishikawa's report states:

I asked [Kaleiohi] if he could get a piece of to [sic] meat to be sent to determine if it was "seal meat." Sam said he could

obtain some meat from his sister's freezer. He then asked that he would like to make a statement to the DOCARE officers. If that was what he wanted to do then I'll go and get the officers, while he got the meat. We would then meet him at his house so he could give his story to them.

Ishikawa's report dated March 29, 1989. Koerte's report states:

[Ishikawa] told Sam, "I think as evidence, they are going to need a piece of seal meat." Sam said that the meat was in his sister's freezer and he would get a piece and go home.

Koerte's report dated March 15, 1989, at 2.

■ In this court's view, both these reports have a material bearing upon the issue of whether Kaleiohi, in seizing the seal meat, was acting as an agent for the government. The court finds, however, that the government's failure to provide the defense with these reports at or before the suppression hearing would not have materially affected the magistrate's determination that Kaneholani's fourth amendment rights were not violated. The magistrate based his determination that Kaneholani's fourth amendment rights were not violated upon a finding that Kaneholani had no expectation of privacy in Reis' freezer.

■ Fourth amendment rights are personal and can only be asserted if the defendant has a "legitimate expectation of privacy" in the area searched. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). A defendant may not object to an illegal search on the ground that it violated the reasonable expectation of privacy of a third person. *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). In order to find an expectation of privacy "reasonable," first, the individual defendant must possess a subjective expectation of privacy; second, society must accept that expectation as reasonable. *California v. Ciraola*, 476 U.S. 207, 106 S.Ct.

1809, 90 L.Ed.2d 210 (1986), *citing Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

 The court agrees with the magistrate's finding that Kaneholani did not have a reasonable expectation of privacy in Reis' freezer. Kaneholani did not own the freezer or even live at the premises where the freezer was located. He merely had Reis' permission to store meat in it from time to time. In a case with facts analogous to those in the present case, the court found that the defendant did not have a reasonable expectation of privacy. *United States v. Shue,* 766 F.2d 1122 (7th Cir. 1985).

In *Shue,* the defendant kept toy guns in a file cabinet in the basement of a building in which he rented an apartment. The file cabinet belonged to the landlord.[11] The court found that because Shue did not have the right to *exclude* others from the basement, he did not have a reasonable expectation of privacy in the file cabinet. 766 F.2d at 1135. The court distinguished the case from *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), in which the apartment owner gave the defendant permission to use, *and to exclude others from,* the premises. *Id.*

Kaneholani did not have the right to exclude others from the use of Mrs. Reis' freezer. Thus, the court finds that Kaneholani did not have a reasonable expectation of privacy in the freezer. Accordingly, the court also finds that the government's failure to provide the defendant with copies of Ishikawa's and Koerte's reports would not have materially affected the magistrate's determination that ·Kaneholani's fourth amendment rights were not violated.

## CONCLUSION

For the foregoing reasons, the court hereby affirms the magistrate's denial of defendant's motion to dismiss the information and to suppress evidence.

IT IS SO ORDERED.

---

**11.** It was not clear whether or not Shue had the landlord's permission to store his possessions in the file cabinet.