**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Norman Z. FLICK and Lowell G. Maynard, Defendants-Appellants.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Norman Z. FLICK and Lowell G. Maynard, Defendants-Appellants.**

Nos. 81–3038, 81–3074, 81–3039 and 81–3075.

United States Court of Appeals, Seventh Circuit.

Submitted Jan. 13, 1983.*

Decided Oct. 11, 1983.

Rehearing and Rehearing En Banc Denied Jan. 12, 1984.

* This case was scheduled for oral argument on January 13, 1983. Counsel for appellant Flick and counsel for the United States filed motions to waive oral argument. Counsel for appellant Maynard orally represented to this court that he also waived oral argument. On January 12, 1983, therefore, the motions to waive oral argument were granted and the case was submitted to the panel sitting on January 13, 1983.

arising from two separate episodes. In one indictment Flick and Maynard were charged with conspiring to steal furniture traveling as a part of an interstate shipment, 18 U.S.C. § 371, and with possessing the stolen furniture, 18 U.S.C. § 659. In the other indictment Flick and Maynard were charged with conspiring to commit mail fraud, 18 U.S.C. § 371; Flick and Maynard were also respectively charged with one and four counts of mail fraud, 18 U.S.C. § 1341. The two indictments were tried separately but the results were the same—the juries found Flick and Maynard guilty on all counts. The district court sentenced Flick to consecutive terms of five years on each of the four counts (twenty years total). Maynard was also sentenced to five years for each of his seven convictions, but four of the sentences are to run concurrently (twenty years total). The appeals have been consolidated and, for the reasons expressed in this opinion, we affirm.

### I. Nos. 81–3038, 81–3074

#### A.

On July 10, 1981, the Grand Jury returned an indictment charging Flick, Maynard, and a man named Nave with conspiring to steal furniture moving as part of an interstate shipment and with possessing the furniture once stolen. Nave pleaded guilty on the conspiracy charge and agreed to testify at the trial that was set for October 21, 1981. Flick's counsel successfully moved for a continuance till November 16, 1981. On November 3, 1981, however, the district court moved the trial date up to November 9, to comply with Maynard's rights under the Speedy Trial Act. On November 9, Flick's counsel moved for a continuance, but the district court ordered the trial to commence.

The government's evidence presented at trial indicates that Flick, Maynard, and Nave met at an Indianapolis coffee shop and decided to steal a trailer of goods that could be sold. Flick then drove Maynard

Ronald S. Lieber, Indianapolis, Ind., Jerry B. Kurz, Hall & Kurz, Chicago, Ill., for Norman Z. Flick.

William C. Erbecker, Indianapolis, Ind., for Maynard.

Gail Bardach, Asst. U.S. Atty., Sarah Evans Barker, U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before CUDAHY and ESCHBACH, Circuit Judges, and KELLAM, Senior District Judge.**

ESCHBACH, Circuit Judge.

Appellants Flick and Maynard were charged in two indictments with crimes

** The Honorable Richard B. Kellam, Senior District Judge for the Eastern District of Virginia, sitting by designation.

and Nave to a railroad yard where trailers are parked. After breaking into several trailers, Maynard and Nave agreed to steal a trailer filled with furniture. Once arrangements for storing the trailer were made, Maynard rented a Ryder truck and drove the trailer to the farm country of southwest Indiana. He left the trailer parked on the frozen ground of Jerry Grose's farm.

The ground, however, did not remain frozen and, six days after the trailer was left at the Grose farm, the trailer had sunk into the mud. With Flick's assistance, Maynard rented another Ryder truck and went to the farm to retrieve the trailer. Flick and Nave also went to the farm to assist Maynard in getting the trailer, but Flick remained in his Buick while the others struggled to extricate the trailer. The trailer was finally freed and Maynard, followed by Flick in his Buick, hauled the trailer to a truck stop where it was abandoned. Apparently the participants had come to view the entire episode as too costly and risky to continue.

### B.

On appeal Flick first maintains that the district court erred in not granting a continuance. The decision whether to grant a continuance, however, is a matter committed to the discretion of the district judge. The trial judge is inevitably in a better position than we are to review the costs and benefits associated with a continuance; therefore "ordinarily the refusal of the trial court to grant a continuance is virtually unreviewable." *United States v. Davis,* 604 F.2d 474, 480 (7th Cir.1979). Nonetheless we may review the district court's decision insofar as Flick contends that the denial of a continuance rendered his counsel's performance constitutionally deficient.

We measure the adequacy of counsel's performance by the totality of the circumstances. *See United States v. Raineri,* 670 F.2d 702, 712 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982). Therefore when an appellant contends that a denial of a continuance amounted to a denial of effective assistance of counsel, we review the trial transcript to assess the counsel's performance. *See United States v. Phillips,* 640 F.2d 87, 92 (7th Cir.), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981). Having examined the entire transcript, we hold that Flick's counsel more than satisfied minimum professional standards. Flick's defense strategy was to characterize the government's case as solely relying on the testimony of Nave—a convicted felon who agreed to testify to limit his own prison sentence. To this end, Flick's counsel vigorously cross-examined Nave and consistently characterized Nave as the sole criminal in this case. The district judge stated at the trial's conclusion that Flick's counsel "did an excellent job." We discern nothing in the record to contradict this statement.

We suppose that an attorney could perform adequately at trial even in the absence of much preparation; however, fairness requires that defense counsel be given adequate time to prepare a defense. We must therefore review, guided by the principle of extreme deference to the district court, Flick's contention that the denial of a continuance precluded adequate preparation.

Flick's attorney filed his appearance in this case on July 16, 1981, nearly four months prior to the trial. One continuance was successfully obtained. To be sure, on November 3, 1981, the district court moved the trial date up from November 16 to November 9. Nevertheless, Flick's counsel had five days to prepare further before trial and, once the trial began, four more days before the defense began its case. On appeal Flick asserts that the limited preparation time prevented the procurement of a handwriting expert. Handwriting, however, played a very small role in the trial and the government's own expert was unable to connect Flick with the government's exhibits. In short, even if we implausibly assume that Flick's counsel was not given a fair opportunity to find a handwriting expert, this is not the type of prejudice warranting a reversal. *See United States v. Aviles,* 623 F.2d 1192, 1196 (7th Cir.1980).

Considering the totality of the circumstances, therefore, we hold that this is not that rare case in which we are going to direct the trial court "how fast to try cases." *United States v. Davis,* 604 F.2d 474, 481 (7th Cir.1979).

■ Maynard asserts that the district court erred in not trying the defendants in separate trials. The decision whether to grant a severance under Fed.R.Crim.P. 14, however, is discretionary and subject to reversal only on the clearest showing of an abuse of that discretion. *See United States v. Hedman,* 630 F.2d 1184, 1200 (7th Cir. 1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). Maynard contends that separate trials were needed because Flick perhaps would have testified favorably at Maynard's trial. We, of course, do not know how Flick would have testified, but we are certain that severance is not mandated "[s]imply because a co-defendant's testimony would contradict the government's case." *United States v. Abraham,* 541 F.2d 1234, 1240 (7th Cir. 1976), *cert. denied,* 429 U.S. 1102, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977). Moreover, the government's evidence evenly implicated both Flick and Maynard; thus, this is not a case in which overwhelming evidence against one defendant unfairly prejudiced another defendant. Maynard recites a litany of reasons why severances should, in general, be granted. This recitation, however, ignores this circuit's "strong policy in favor of joint trials." *United States v. McPartlin,* 595 F.2d 1321, 1333 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). We therefore find no abuse of discretion in the district court's decision to try Flick and Maynard together.

Relying on the Fifth Amendment, Maynard further contends that due process was violated by permitting Nave to identify Maynard in court. During a hearing conducted out of the jury's presence to determine whether a conspiracy existed, *see United States v. Santiago,* 582 F.2d 1128 (7th Cir.1978), Nave testified that he did not see Maynard in the courtroom. After then describing Maynard, Nave was shown six photographs and correctly identified Maynard's picture. When Nave subsequently testified before the jury, he did identify Maynard in the courtroom. Although Nave was cross-examined about his previous inability to identify Maynard, Maynard claims that due process required exclusion of the in-court identification.

In determining whether Nave's identification of Maynard was constitutional, we must weigh any corrupting effect of a suggestive identification procedure against the indicia that the identification was reliable. *See Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). We are mindful that the standard is one of fairness and that absent a very substantial likelihood of irreparable misidentification, the probative value of the in-court identification was for the jury to decide. *See id.* at 116, 97 S.Ct. at 2254.

■ Initially we are not prepared to find that the photograph-identification procedure was unduly suggestive. The six photographs shown to Nave presented a fair sample and did not direct Nave's attention to Maynard's picture. When Nave was shown the six photographs Maynard was, of course, sitting at a table in the courtroom. However, as testified to by a government witness, Maynard's appearance had changed dramatically from the time of the crimes till the time of the trial (e.g., grew a mustache, curled his hair, wore eyeglasses). Indeed, several witnesses selected Maynard's photograph from an array but were unable to identify Maynard in court. Maynard's presence during the photographic identification, therefore, does not appear to have been greatly suggestive.

This is not to say that the photograph-identification procedure did not affect Nave's in-court identification of Maynard; Nave identified Maynard only after selecting Maynard's photograph. Yet instead of creating a substantial likelihood of misidentification, the photograph-identification procedure probably alerted Nave to Maynard's change in appearance and facilitated a correct in-court identification. Moreover, Nave was not a brief eyewitness to the

crime but was a co-conspirator who testified, without contradiction, that he had known Maynard for several weeks before the crime. Furthermore, Maynard himself testified that although he did not know that the trailer filled with furniture was stolen, he rented a truck and pulled the trailer out of the mud; Maynard's participation in the events was thus undisputed. In light of all the circumstances, therefore, Nave was constitutionally permitted to identify Maynard in court.

■ Finally, we reject both appellants' contention that the evidence was insufficient to convict. Nave's testimony, by itself, was sufficient to prove the existence of a conspiracy between Maynard, Flick, and Nave. According to Nave the three of them decided to steal a trailer of goods and, with this agreement in mind, drove to the railroad yard where Maynard and Nave searched for a suitable trailer. The charge of possessing stolen goods was also established by Nave's testimony that Flick and Maynard hauled the trailer from Grose's farm and drove it to a truck stop where it was abandoned.

Flick and Maynard attack Nave's credibility but it is well established that issues of credibility are for the jury, not us, to decide. See United States v. Redwine, 715 F.2d 315, at 319 (7th Cir.1983); United States v. Baskes, 687 F.2d 165 (7th Cir. 1981). This is true even if the government's key witness is a co-conspirator. See United States v. Alger, 325 F.2d 502, 503 (7th Cir.1963), cert. denied, 376 U.S. 963, 84 S.Ct. 1124, 11 L.Ed.2d 981 (1964). Moreover, Nave's testimony was corroborated by other evidence. Leaving circumstantial evidence such as telephone records and motel registrations aside, two eyewitnesses selected Maynard's photograph as the driver who brought the trailer to the Grose farm. Another eyewitness stated that the same person drove the trailer to the farm and six days later hauled the trailer away. Maynard himself testified that he was the person who, with Flick's assistance, drove the trailer from the Grose farm. There was more than sufficient evidence, therefore, for the jury to return guilty verdicts.

II.   Nos. 81–3039, 81–3075

A.

On August 25, 1981, Flick and Maynard were indicted on charges of mail fraud and conspiracy to commit fraud using the mails. The trial was scheduled to commence on October 13, 1981, but Flick's attorney obtained a continuance till November 30, 1981. On November 24, 1981, the district court denied a request for another continuance. A different attorney, therefore, immediately filed his appearance on Flick's behalf six days before the trial was scheduled to begin. Flick's new attorney also made an unsuccessful motion for a continuance and the matter went to trial on November 30, 1981.

The government's case at trial revealed that Maynard, using the name Brandon Engle, leased a home in Carmel, Indiana, owned by a couple named Carroll. After discovering the encumbrances on the property, Flick directed Nave to forge five documents that Nave recorded at the county courthouse. These documents were three mortgage releases, one release of an assignment of leases, and one quitclaim deed purportedly conveying Deret Carroll's interest in the home to her husband, Michael Carroll.

Maynard then began to pose as Michael Carroll, the owner of an apparently unencumbered piece of property. Maynard listed the home with a real estate agent who soon found a buyer. The sale was closed on April 13, 1981, with Maynard (of course posing as Michael Carroll) receiving checks totaling nearly $100,000. Equipped with a forged driver's license, Maynard was able to cash the checks at four branch offices of a local bank.

Four mailings formed the bases of the substantive mail fraud charges. Flick and Maynard were both charged in connection with the mailing of the recorded documents from the courthouse to the home in Carmel, Indiana. Maynard was also charged with three mailings (two bills and one payment of a bill) associated with an answering ser-

vice hired by Maynard to facilitate and conceal the fraudulent scheme.

### B.

■ Flick contends in this appeal that the district court committed reversible error in not granting a continuance on November 24, 1981. As noted previously, absent a deprivation of Sixth Amendment rights, the decision not to grant a continuance is virtually unreviewable. After examining the entire trial transcript, we hold that Flick's counsel performed well—far exceeding the minimum standards of competent performance. We also hold that the district judge did not abuse his discretion in concluding that Flick's counsel had adequate preparation time. The trial occurred more than two months after Flick's original counsel filed his appearance. We are aware that this attorney withdrew and Flick's trial counsel appeared only six days before the trial began. Apart from the inability to obtain a handwriting expert, however, Flick points to no reason why more time was needed. Indeed, Maynard's attorney, who did not complain of a lack of time, called no defense witnesses while Flick's attorney called two. Moreover, long before the trial began Flick himself was aware of the importance of handwriting in this case. He was ordered to produce handwriting samples and, failing to do so, appeared in court for a hearing on why he should not be held in contempt. The responsibility for failing to locate a handwriting expert, therefore, rests with Flick and his attorneys and not with the district judge.

■ Similarly meritless is Flick's assertion that there was insufficient evidence to convict. Nave, once again a key government witness, testified that Flick directed him to forge the releases and quitclaim deed and, after Flick applied his notary seal, to deliver the documents to the local county courthouse. The government also introduced into evidence a piece of paper containing, in Flick's handwriting, the names "Michael" and "Deret Carroll" and the address of their Carmel, Indiana, home. Furthermore the evidence established that Flick rented a motel room that was used by Maynard during the days immediately preceding the real estate closing on April 13, 1981.

There was also sufficient proof that the forged releases and quitclaim deed were, in fact, mailed back from the courthouse to the home in Carmel, Indiana. A deputy recorder testified that a book is used to keep track of original documents after photographs are made and recorded. According to her testimony, if a name and address appear in this book next to a document's description, the document was mailed. She examined the book at trial and, based on her knowledge of office procedure, unequivocally stated that the documents in question in this case were mailed. This testimony based on office procedure was sufficient proof of mailing. *See United States v. Ledesma*, 632 F.2d 670, 675 (7th Cir.), *cert. denied*, 449 U.S. 998, 101 S.Ct. 539, 66 L.Ed.2d 296 (1980); *United States v. Flaxman*, 495 F.2d 344, 349 (7th Cir.), *cert. denied*, 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974).

■ The appellants' final argument is that the mailings were too attenuated to transform this real estate fraud into a federal mail-fraud crime under 18 U.S.C. § 1341. We disagree and hold that the mailings were caused by the appellants and were "for the purpose of executing" the fraudulent scheme, *see id.*

Parties to a fraudulent scheme are said to have caused a mailing if "they committed acts with the knowledge that use of the mails would follow in the ordinary course of business, or when use of the mails could reasonably be foreseen." *United States v. Wormick*, 709 F.2d 454, 461 (7th Cir.1983). Clearly the appellants caused the mailing of the recorded documents because the recorder's office was directed to mail the original documents to the home in Carmel, Indiana. Maynard himself mailed the money order paying the answering service's bill and he could have reasonably foreseen that, in hiring the answering service, he would receive periodic statements through the mails.

The mailings were also made for the purpose of executing the fraudulent scheme because each mailing was incidental to or a normal concomitant of an essential element of that scheme, *see United States v. Clark,* 649 F.2d 534, 542 (7th Cir.1981); *United States v. Lea,* 618 F.2d 426, 430 (7th Cir.), *cert. denied,* 449 U.S. 823, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980). The mailing of the recorded documents was more than incidental to the recording—an essential element of the fraud. The mailing of the documents to the Carmel, Indiana, address gave the appearance of regularity, ensured that the documents would not be returned to the banks purportedly releasing the mortgages and assignment, and permitted Maynard to possess the original documents to show a real estate agent that the property was unencumbered.

Moreover, Maynard engaged the answering service at the scheme's incipiency to play an integral role. The answering service's telephone number was given to the rental agency that rented the home to Maynard. The number was also given to the title insurance company that discovered the property's encumbrances which were later released by the forged documents. And the number was given to the real estate agent employed by Maynard to find a buyer for the home. Not only did the answering service provide the vital means of linking the scheme's elements, the service provided a buffer that helped conceal the schemers, *see United States v. Wormick,* 709 F.2d 454, 462 (7th Cir.1983). Because the answering service was the only method of contacting Maynard, he was protected from physical detection in the event that the scheme collapsed. He may have also been able, through monitoring the calls to the service, to discover problems warranting a quick and undetected departure from the area.

### III.

The judgments of the district court are affirmed.