**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Charles SHUE, Defendant-Appellant.**

**No. 83–2053.**

United States Court of Appeals,
Seventh Circuit.

Argued June 8, 1984.

Decided July 8, 1985.*

---

\* On consideration of the petition for rehearing, this amended opinion has been filed and issued this 8th day of July, 1985. In light of the amended opinion, the petition for rehearing is denied.

James D. O'Connell, Asst. U.S. Atty., Chicago, Ill., Dan K. Webb, U.S. Atty., for plaintiff-appellee.

Richard C. Leng, Chicago, Ill., for defendant-appellant.

Before WOOD, ESCHBACH and EDWARDS,** Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.***

Appellant Charles Shue challenges his convictions for bank robbery and conspiracy on the grounds, among others, that the government violated his due process rights by unfairly commenting on his exercise of the right to remain silent after arrest. We hold that the government's comments exceeded the boundaries of fairness and violated due process under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). We further hold that, under the circumstances of this case, the constitutional error was plain, and was not harmless. We reject appellant's other alleged errors, however, and affirm the conviction in the count not involving the *Doyle* violation.

I.

Appellant Shue was charged with robbing or attempting to rob five banks with different accomplices. One alleged accomplice and two other associates of appellant testified against him. Appellant was convicted on a conspiracy count (Count I), one attempted robbery count (Count III), and two robbery counts (Counts II & IV). A verdict of acquittal was directed on one

---

** The Honorable George Clifton Edwards, Jr., Circuit Judge of the Sixth Circuit, sitting by designation.

*** Judge Eschbach contributed to this opinion.

robbery count (Count VI)[1] and the jury acquitted appellant on another robbery count (Count V). Appellant was sentenced to thirty years imprisonment followed by five years probation.

Appellant, fifty-seven years old at the time of trial, had retired as a dental technician in 1979 and moved from Chicago to Las Vegas, but returned frequently to Chicago. His co-defendant, Carol Gesior, was his constant companion.[2]

Appellant met Michael Raduazzo in the late 1970's. The two lived in the same apartment complex in Las Vegas, and both frequented the same club in Chicago. Raduazzo, a government witness at appellant's trial, testified that appellant drove him to Chicago in early 1980 and the two robbed the Colonial Bank and Trust there (Count II) on March 21, 1980, armed with a sawed-off shotgun and a handgun. A photographic expert testified that surveillance photographs showed the robber was 5'9", with a one inch margin of error. Appellant is 5'9". A man who saw the unmasked robbers before they commandeered his car did not identify anyone in a lineup.

Raduazzo testified that after the robbery, he, appellant, and Gesior went to Las Vegas. Raduazzo testified that after returning to Chicago, he and appellant attempted to rob the Argo State Bank in Chicago (Count III) on May 5, 1980, armed with a handgun. Raduazzo was shot and apprehended in the bank while his accomplice escaped. An expert testified that surveillance photographs put the escaped robber at 5'10", with a one inch margin of error.

Raduazzo pled guilty and was sentenced to six months in prison. After his release, he was subpoenaed by a grand jury and asked who his accomplice was. At appellant's trial, Raduazzo testified that he first lied to the grand jury, then, on appellant's advice, refused to testify, was cited for contempt, and, after six months in jail, implicated appellant in July 1981.

About this time appellant began using an assumed name, Joseph Papp. At his trial, appellant, taking the stand in his own defense, explained that he had received a message to call Raduazzo in July 1981 and did so. Appellant testified that Raduazzo said he had believed appellant was killed in a car accident, and had told the FBI that appellant was his accomplice in the Argo State Bank robbery. Appellant said Raduazzo told him that his real accomplice's description was very different from appellant's, so even if arrested appellant could not be charged. Finally, in response to defense counsel's question why he did not go to the FBI at that time to clear himself, appellant testified that Raduazzo warned him he would be arrested and held for six months to a year during an investigation. Appellant said Raduazzo suggested that appellant use a different name.

On July 28, 1981, the Norwood Federal Savings and Loan Association in Chicago (Count IV) was robbed by a man holding a bag in front of his face. A photographic expert said he could not positively identify appellant from the surveillance photograph, but said the photograph did bear some similarity to the lineup photograph of appellant. Two tellers observed the lineup: one picked out appellant and another man, and the other made no identification at the lineup but later said the lineup photograph of appellant resembled the robber. A toy gun was found at the scene; three toy guns were found in a search of appellant's living quarters when he was arrested over a year later.

Appellant, now as Joseph Papp, went to Arizona and returned to Chicago in the fall of 1981. Appellant testified that he asked

---

1. The district judge directed the verdict when one of appellant's alleged accomplices, Shelby Dotson, refused to testify even after a grant of immunity. The district judge held Dotson in contempt and this court affirmed his contempt citation in an unpublished order. *United States v. Shue*, In re *Dotson*, 740 F.2d 971 (7th Cir. 1984).

2. Gesior was indicted on five counts and was acquitted on all counts. One government witness, Michael Raduazzo, who testified against Shue, testified for Gesior.

a friend in Las Vegas, Art Ippolito (who frequented the same club in Chicago), to help him find a place to stay in Chicago. Ippolito referred him to Charles Budrius, another government witness at appellant's trial. Budrius introduced appellant to George Wenta. Wenta rented his basement, which his wife and friends used for storage, to appellant for $100 per month. Appellant was in and out of Chicago. Budrius testified that when appellant was in Chicago in early 1982, he tried to persuade Budrius to participate in a bank robbery, but Budrius declined. Budrius also testified that appellant asked him to steal a car. Budrius refused, but introduced appellant to Shelby Dotson as one who would steal a car for him.

In February 1982, appellant was in Las Vegas and met James Turner, the third government witness against appellant, through Art Ippolito. Appellant testified that just after meeting Turner, he drove Turner to Los Angeles twice and Turner allowed appellant to use his credit card on a later trip to Chicago. Turner, however, testified that he and appellant attempted two bank robberies in Los Angeles and one in Las Vegas, where Turner was arrested. Turner testified that, while in jail, he recruited one Hank Sheese at the behest of Art Ippolito. Turner admitted lying to the FBI and to a grand jury.

Budrius testified that back in Chicago in March 1982, appellant had Dotson steal a car for him (Budrius went along), and appellant purchased a gun from his landlord, Wenta. The government charged appellant with robbing the Liberty Bank in suburban North Riverside (Count V) on March 19, 1982, with Dotson and Gesior. As noted above, Dotson refused to testify despite a grant of immunity. Surveillance photographs indicated the robber was 5'10", with a one inch margin of error. Part of the proceeds of that robbery included $550 in five-dollar bills; appellant had paid Dotson and Budrius for the car theft and Wenta for the gun and rent with $750 in five-dollar bills. The jury acquitted appellant on this count.

Appellant and Dotson then went to Las Vegas, as did Budrius. Budrius testified that Dotson told him appellant, Dotson, and Sheese tried to rob a bank in Los Angeles, and appellant left the others stranded there. Budrius admitted robbing a bank with Dotson and Sheese, which he testified appellant previously had discussed robbing, and admitted planning to rob another bank with Dotson and Sheese.

The government charged appellant with robbing the Peerless Federal Savings and Loan in Mount Prospect (Count VI) on May 21, 1982, with Dotson and Gesior. A directed verdict of acquittal on this count was entered after Dotson refused to testify.

In his testimony, appellant admitted knowing Raduazzo, Budrius, Turner, Sheese, and Dotson, and buying a gun from Wenta. He said that since his retirement he travelled often because he had much idle time. He claimed to live on $40,000 that he had saved, which Gesior had deposited in a Las Vegas bank account under her own name and from which she withdrew money as she and appellant needed it. Appellant did not know the name of the bank.

## II.

Appellant argues that the government deprived him of due process of law by commenting in cross-examination and closing argument on appellant's failure to tell his version of events to the FBI after his arrest.

Upon being subjected to interrogation in police custody, a suspect must be informed of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which of course include the right to remain silent. *Miranda* teaches that the prosecution may not use at trial "the fact that [the defendant] stood mute or claimed his privilege in the face of accusation." *Id.* at 468 n. 37, 86 S.Ct. at 1624 n. 37. The Supreme Court has held further that the prosecution may not use a defend-

ant's post-arrest silence[3] to impeach an exculpatory story told at trial. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *see also United States ex rel. Allen v. Franzen*, 659 F.2d 745, 747 (7th Cir.1981), *cert. denied*, 456 U.S. 928, 102 S.Ct. 1975, 72 L.Ed.2d 444 (1982). The Court noted that implicit in the *Miranda* warnings is an assurance that silence carries no penalty, and, due to the warnings, every post-arrest silence is insolubly ambiguous. *Doyle*, 426 U.S. at 617, 96 S.Ct. at 2244; *see also United States v. Hale*, 422 U.S. 171, 177, 95 S.Ct. 2133, 2136–37, 45 L.Ed.2d 99 (1975).

Here, the government's remarks appear to directly conflict with the rule of *Doyle* by implying that appellant's exculpatory story was false because he did not tell it to the FBI after his arrest. On cross-examination, the government asked appellant:

Q: When you were arrested, the Chicago Police Department took you and Ms. Gesior down to the police station, is that right?

A: Yes, sir.

Q: You were put in a room by yourself, weren't you, Mr. Shue?

A: Yes, sir.

Q: And Agent Keefe of the FBI came into that room during the course of that night, didn't he?

A: Yes, sir.

Q: He said, "Mr. Shue, I am Bill Keefe from the FBI," didn't he?

A: Yes, sir.

Q: He said, "Mr. Shue, I would like to talk to you about some matters?"

A: Yes, sir.

Q: And you said, "I refuse to talk to you, Mr. Keefe," didn't you?

A: Yes, sir, because I understood it was my right not to talk to any law enforcement officer unless my lawyer was present—that's what I understood—and they advised me of that right.

Q: Mr. Shue, would you tell the ladies and gentlemen of the jury prior to your testimony here today in this courtroom, you tell us who you have told this story to about Mr. Ed [sic] Raduazzo framing you in this bank robbery?

A: I told it to my lawyer.

\* \* \* \* \* \*

Q: I see. But you didn't tell it to the FBI, did you?

A: I was advised not to talk to the FBI.

Q: I see. You were advised to stand here as a defendant charged with six bank robberies, Mr. Shue?

A: I wasn't charged with six bank robberies when I was arrested.

Q: You have been under indictment for six bank robberies for some time, haven't you?

A: Yes, sir.

Q: You never told the FBI that you didn't do it, did you?

A: I was advised by my lawyer not to talk to the FBI. I understood that was my right. That's what they read me when they arrested me.

Q: It's also your right, Mr. Shue, to be a free man if you didn't commit a crime. Do you understand that?

A: Yes, sir.

MR. LENG (for appellant): I have to object.

THE COURT: Sustained.

At the very end of closing argument, the government told the jury:

Well, on September 9, when he was arrested, and Agent Keefe walked into that room, he said, "Mr. Shue, I am glad to meet you. I am Bill Keefe. I got a lot of things I want to talk to you about." He refused to talk to the FBI, refused. And no one ever heard of this

---

**3.** Post-arrest silence is treated differently from pre-arrest silence, which may be commented upon to impeach the credibility of an exculpatory story offered at trial. *See Jenkins v. Anderson*, 447 U.S. 231, 238, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980). Appellant does not object to, and we see no problem with, the cross-examination and closing comments in this case that referred to appellant's failure to go to the FBI to clear himself after he heard that Raduazzo had named him as an accomplice but before he was arrested.

preposterous, incredible story of a frame until he hit the witness stand.

It defies all belief, ladies and gentlemen. It defies any common sense.

The government argues in response that appellant's testimony on direct examination, describing how he cooperated with the FBI's evidentiary requests after his arrest, opened the door for the government's use of appellant's post-arrest silence to impeach the impression of full cooperation. The colloquy on direct went as follows:

Q: Now, after you were arrested, you were charged with bank robbery, is that correct?

A: Yes, sir.

Q: Did they ask you to give your fingerprints?

A: Yes, sir.

Q: Did you cooperate?

A: Yes, sir.

Q: Did they ask you for hair samples?

A: Yes, sir.

Q: Did you give it to them?

A: Yes, sir.

Q: Did they ask you to give you [sic] examples of your handwriting?

A: Yes, sir.

Q: Did you give it to them?

A: Yes, sir.

Q: Did they ask you to come and appear in lineups?

A: Yes, sir.

Q: Did you do that?

A: Yes, sir.

We agree with the government that, although appellant never directly claimed to have cooperated fully with the authorities after his arrest, this exchange did create the impression of general cooperation. A defendant should not be permitted to twist his *Miranda* protection to shield lies or false impressions from government attack. The Supreme Court provided an exception to the *Doyle* rule in such a case:

It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. Cf. *United States v. Fairchild,* 505 F.2d 1378, 1383 (CA5 1975).

*Doyle,* 426 U.S. at 619 n. 11, 96 S.Ct. at 2245 n. 11. The circuit courts have recognized exceptions to the *Doyle* doctrine under similar circumstances. *See, e.g., Stone v. Estelle,* 556 F.2d 1242, 1245 (5th Cir. 1977) (defendant on cross admitted that, on direct, he sought to suggest cooperation with police; although court disapproved of prosecution's rebuttal of that suggestion, held no due process violation), *cert. denied,* 434 U.S. 1019, 98 S.Ct. 742, 54 L.Ed.2d 767 (1978); *United States v. Conlin,* 551 F.2d 534, 537 (2d Cir.) (defense counsel claimed defendant made exculpatory statements at time of arrest; prosecution could rebut defense version of events), *cert. denied,* 434 U.S. 831, 98 S.Ct. 114, 54 L.Ed.2d 91 (1977); *Fairchild,* 505 F.2d 1378, 1383 (5th Cir. 1975) (cited in *Doyle*) (defense counsel raised issue of cooperation; prosecution could rebut impression of full cooperation).

When a defendant has alleged or created an impression of general cooperation with police after arrest, a court may allow the prosecution to elicit testimony of the defendant's post-arrest silence to rebut the impression of full cooperation. In *Fairchild,* defense counsel called a government agent and, after eliciting that the defendant had no prior record and voluntarily gave handwriting samples, asked, "During ... this investigation ..., to your knowledge has Mr. Fairchild cooperated fully with the FBI and U.S. Attorney's office in responding with anything that you all wanted?" 505 F.2d at 1383. The Fifth Circuit held that this question raised the issue of the defendant's cooperation and opened the door to a full development of the issue. *Id.* The defendant's post-arrest silence could be used to rebut the impression of cooperation.

The Fifth Circuit in *Fairchild*, however, clearly held that an opened door does not give the government license to use post-arrest silence in every aspect of the case. In *Fairchild*, the government proceeded to use the post-arrest silence not only to rebut the impression of full cooperation, but also as direct evidence of an element of the crime: that the defendant knew the vehicles in question were stolen. The court held that this usage was impermissible. *Id.* No objection was made, however, and the court on the facts of the case did not find plain error. *Id.* at 1384. *See also Morgan v. Hall*, 569 F.2d 1161, 1168 (1st Cir.) (although defendant first raised fact of post-arrest silence, prosecution's use of silence to undermine defendant's exculpatory story was reversible error), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1142 (1978).

■ This court likewise has acknowledged that while the government may use a defendant's post-arrest silence to impeach testimony about the circumstances of an arrest, the government may not then argue that the defendant's silence was inconsistent with his claim of innocence. *See United States v. Mavrick*, 601 F.2d 921 (7th Cir.1979). In *Mavrick*, the defendant on direct testified that at the time of his arrest he attempted to explain his conduct, but the police did not give him an opportunity to speak: "No, they told us to shut up, and they don't want to hear it." *Id.* at 932. On cross-examination, the prosecution asked if the defendant had an opportunity to explain at the time of his arrest or shortly thereafter; the defendant again testified that he had not. The prosecution did not pursue the matter further in cross-examination or closing argument.

In *Mavrick* we noted that the prosecution's questions were not clearly trying to elicit an admission of the defendant's post-arrest silence. We remarked that the prosecution's inquiry ordinarily would be improper because it would tend to elicit testimony about the defendant's silence, but in the particular case the defendant had raised the issue of his opportunity to explain to the arresting officers, and the prosecution could extend the issue to ask whether the defendant had an opportunity to explain to the FBI agents who came on the scene almost immediately thereafter. *Id.* at 933. We did impose a limit on the prosecutor's use of the issue. "[T]he defendant's testimony would not permit the government to argue that his post-arrest silence was inconsistent with his claim of innocence, . . . ." *Id.* (dicta). The government in *Mavrick* had not argued the defendant's silence to the jury, and the cross-examination did not suggest that the defendant's silence necessarily was inconsistent with his exculpatory story, so we found no unfairness there. *Id.* at 934.

We have an altogether different situation in the case at bar. The thrust of the cross-examination excerpted above was not limited to the permissible use of impeaching appellant's credibility regarding his cooperation or lack thereof; these questions followed an exchange in which the government had highlighted appellant's use of an alias and failure to go to the FBI *prior to* his arrest. If any doubt about the impact of the government's suggestion remained, closing argument put that to rest: "He refused to talk to the FBI, refused. And no one ever heard of this preposterous, incredible story of a frame until he hit the witness stand." [4]

**4.** The government argues that a second purpose was served by mention of appellant's post-arrest silence. The government claims the appellant's silence was also used to contradict his testimony on direct as to why he did not go to the authorities to clear himself. On direct, appellant was asked:

> Q: Why didn't you walk down to the FBI office and tell them what had happened?
> A: Because he [Raduazzo] said in regards to the investigation, if I were arrested, it would

take anywhere from six months to a year that they would hold me [while] investigating me.
> Q: You didn't believe that, did you?
> A: Yes, sir, I did.

The government argues that appellant's silence was inconsistent with this testimony because once appellant was arrested he could no longer believe he would avoid detention by remaining silent. There are, however, many other reasons to explain post-arrest silence, *see United States v. Hale*, 422 U.S. 171, 177, 95 S.Ct. 2133, 2136–

In *United States ex rel. Saulsbury v. Greer*, 702 F.2d 651 (7th Cir.), *cert. denied*, 461 U.S. 935, 103 S.Ct. 2104, 77 L.Ed.2d 310 (1983), we approved the way in which the government used the defendant's post-arrest silence. Saulsbury testified at trial that he had stabbed the deceased in self-defense. When asked on direct examination why he had not volunteered his version of the stabbing when he was arrested, the defendant stated that the sheriff had read him his rights and that, since he (Saulsbury) was on parole, he did not think the sheriff would believe his story. On cross-examination the prosecutor asked three questions to elicit the same testimony and then asked two more questions to show that Saulsbury had not volunteered his self-defense story when the sheriff later told him that he was charged with murder. In his closing argument, the prosecutor suggested that the jury should disbelieve the defendant's self-defense story because, once a victim dies, someone charged with murder would disregard his distrust of police and his right to remain silent and would tell the sheriff that the stabbing was in self-defense.

Although this case is arguably indistinguishable from *Saulsbury*, we find a qualitative difference between the prosecutor's use of the defendant's post-arrest silence in *Saulsbury* and the government's use of Shue's post-arrest silence. In this case, the government has crossed that fine line between permissible and impermissible uses of such silence. The prosecutor in *Saulsbury* asked only whether the defendant had remained silent and, when arguing to the jury, the prosecutor stated that the government was not attacking Saulsbury for exercising his constitutional rights. In the present case, the Assistant United States Attorney not only asked Shue whether he had ever told the FBI that he was framed but also asked whether he was "advised to stand here as a defendant

charged with six bank robberies" and whether he understood that it was his right to be a free man if he did not commit a crime.[5] The government's closing argument made no mention of Shue's right to remain silent.

Although a slight suggestion of guilt is "inextricably intertwined" with any use of post-arrest silence to impeach credibility, *Saulsbury*, 702 F.2d at 656 (quoting *Doyle v. Ohio*, 426 U.S. 610, 635–36, 96 S.Ct. 2240, 2253, 49 L.Ed.2d 91 (1976) (Stevens, J., dissenting)), the slight suggestion of guilt is grudgingly permitted only because the government needs to impeach the defendant's proffered reason for remaining silent. *See Mavrick*, 601 F.2d at 933–34. In the present case the Assistant United States Attorney's cross-examination of Shue and closing argument implied more than the slight, "inextricably intertwined" suggestion of guilt—the prosecutor emphasized the suggestion of guilt. This use violates our notion of fundamental fairness.

*Saulsbury* is also distinguishable because in that case the defense attorney on direct examination *solicited* Saulsbury's explanation for his silence. 702 F.2d at 655–56. In the instant case, the defense attorney did not solicit Shue's explanation—Shue volunteered it on cross-examination when the prosecutor asked him if he had refused to talk to the FBI agent immediately after arrest. Although the prosecutor did not *solicit* the explanation, he did elicit it by his question. It is entirely foreseeable that a defendant on cross-examination will offer explanations to make his answers to yes-or-no questions seem more plausible. But for the prosecutor's question, Shue would have never offered an explanation for his silence. Although the prosecutor probably did not intend to elicit an explanation for the purpose of impeaching it, he could be viewed as unfairly setting a trap for an unwary defendant. We therefore

37, 45 L.Ed.2d 99 (1975), and we do not believe appellant's silence was "much more than ambiguous" and "blatantly inconsistent with the defendant's trial testimony" so as to fall outside the *Doyle* rule. *See Fairchild,* 505 F.2d at 1382.

5. The trial court sustained an objection to this last question, but the question nonetheless illustrates the emphasis of the government's cross-examination.

decline to extend *Saulsbury* beyond those cases in which the defendant offers his explanation as part of a deliberate defense strategy.

The government violated appellant's right to due process by using his post-arrest silence in an obvious reach beyond fair limits to impeach his explanatory story as a recent fabrication. The government implied that appellant's silence upon arrest was inconsistent with his claim of innocence. This would essentially be an admission by silence, standing the protection of *Miranda* on its head. If the government believed appellant's story was so preposterous and incredible, it should have looked for another means to attack it.

### III.

Constitutional error, however, is not necessarily reversible error. At a side bar conference prior to cross-examination, defense counsel objected to the government's use of appellant's refusal to talk with the FBI.[6] Defense counsel did not give a specific basis for his objection, did not make a continuing objection, and did not renew the objection at the time of the precise questions and argument. We need not decide whether the objection at the side bar constitutes a timely objection, which it may have been, because, even if the objection was not sufficient, we find the error plain.

We may notice an error as plain error under Federal Rule of Criminal Procedure 52(b) if we find reversal necessary to avoid a miscarriage of justice. *See United States v. Frady*, 456 U.S. 152, 163 & n. 13,

102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982). Errors of constitutional dimension, such as the due process violation here, are more freely noticed than are less serious, nonconstitutional errors. *See* 3A C. Wright, *Federal Practice and Procedure* § 856, at 342 (1982). *Cf. United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir.1984) (plain error test for non-constitutional error). The appellate courts have held that impermissible use of a defendant's post-arrest silence may be plain error, *see, e.g., United States v. Edwards*, 576 F.2d 1152, 1154 (5th Cir.1978) (per curiam); *United States v. Lopez*, 575 F.2d 681, 685 (9th Cir.1978), and we so hold.

Constitutional error is reversible error unless it is harmless beyond a reasonable doubt. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The burden of proving a constitutional error harmless rests upon the government. *Chapman*, 368 U.S. at 24, 87 S.Ct. at 828. While the result of a harmless error analysis depends on the circumstances of the particular case, we note that post-arrest silence due process violations often have been held reversible error. *See, e.g., United States ex rel. Allen v. Franzen*, 659 F.2d 745, 748 (7th Cir.1981), *cert. denied*, 456 U.S. 928, 102 S.Ct. 1975, 72 L.Ed.2d 444 (1982); *Williams v. Zahradnick*, 632 F.2d 353, 360–65 (4th Cir.1980) (citing cases); *Edwards*, 576 F.2d at 1155; *Morgan v. Hall*, 569 F.2d 1161, 1168 (1st Cir.), *cert.*

---

6. Mr. DUFFY (for the government): The second matter, as I understand the direct testimony after Mr. Raduazzo told him he had given him his name—the testimony about the automobile accident, this is in July of '81—he started using an alias; and he also testified when he was arrested in September of 1982 by the FBI, *at least the impression is he was very cooperative* and provided fingerprints, handwriting and hair samples.
 As Your Honor well knows, the Government has the authority to subpoena those matters, and that was discussed with Mr. Leng, and that's why those matters were obtained. [They] were told we would subpoena those.

When asked by the FBI to talk to them, he refused to talk to the FBI when he was arrested. Your Honor, I would like to go into that area also.
 THE COURT: Okay. Proceed. Bring out the jury.
 MR. LENG (for appellant): Your Honor, I object.
 THE COURT: To which?
 MR. LENG: To his going into the refusal to talk with the FBI.
 THE COURT: Okay. The objection will be noted.
 (Emphasis added).

*denied,* 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1142 (1978).

■ In this case, the evidence against appellant is not so overwhelming as to convince us that the government's comments could not have played a role in the jury's guilty verdicts. As we read the transcript, the prosecutor was trying to cultivate in the jurors' minds the idea that Shue's exculpatory story to the effect that Raduazzo framed him was a recent fabrication. If so, then the prosecutor's conduct is relevant to Shue's convictions on Counts II and III, charging the robbery of Colonial Bank and Trust Company and the attempted robbery of Argo State Bank, the only robberies as to which Raduazzo testified. Apart from Raduazzo's testimony, the evidence linking Shue to these crimes was thin indeed. No eyewitness (other than Raduazzo) identified Shue as a participant in either crime. Other circumstantial evidence was not strong enough to be an independent basis for conviction. Thus the verdict on Counts II and III depended primarily on the jury's assessment of the credibility of Raduazzo and Shue.

Raduazzo testified that when he was interrogated by investigators after the Argo robbery (where he was shot and apprehended), he denied that Shue had been an accomplice and named three others. He implicated Shue only after spending six months in jail for contempt when he refused to testify before a grand jury, although immunized. This background ought to have made the jury at least wary of Raduazzo's testimony. To be sure, his testimony as to the details of the crimes was corroborated in many respects by the testimony of other witnesses. But the accuracy of his description of events does not mean that he truthfully identified his accomplice. Raduazzo made it clear by his pre-trial conduct that he did not want to identify his accomplice. He made up names at first. After spending six months in jail, he may have decided to tell the truth. Or he may have decided to continue to lie, but more plausibly, by identifying a real person, albeit the wrong one. Shue's

story that Raduazzo picked him, thinking him dead, is unlikely-sounding but not obviously absurd. A rational jury could have believed it and could have reconciled the supposed inconsistencies. Deciding whether to believe Raduazzo or Shue could not have been easy for the jury. In this milieu, the prosecutor's effort to present Shue's story as a recent fabrication by arguing from his post-arrest silence may very well have influenced the verdict.

The jury also found Shue guilty of conspiracy to rob banks, but there was only one count (Count I), which covered several different robberies, including those in which Raduazzo participated and other as well. The jury could have also based this guilty verdict on Raduazzo's testimony, in which case the verdict on Count I may also have been affected by the prosecutor's misconduct.

We therefore hold that the government has failed to prove that the constitutional error was harmless beyond a reasonable doubt. We reverse appellant's convictions on Counts I, II, and III and remand for a new trial.

### IV.

The improper use of Shue's post-arrest silence does not mandate reversal of Count IV, however, since neither Raduazzo's testimony nor Shue's alibi concerned the Norwood bank robbery. Reviewing Shue's challenges to his conviction on Count IV, we conclude that they lack merit and affirm.

■ Rule 8(a) provides that

(a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Fed.R.Crim.P. 8(a). On appeal, whether two counts are properly joined is a question of law, and we may reverse a conviction obtained under an improperly joined count. *See United States v. Rodgers*, 732 F.2d 625, 628 (8th Cir.1984); *United States v. Werner*, 620 F.2d 922, 926 (2d Cir.1980); *see also United States v. Hedman*, 630 F.2d 1184, 1200 (7th Cir.1980) ("Improper joinder under Rule 8 requires mandatory severance."), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981).

 In the present case, Shue argues that the separate robbery counts were misjoined. Since we reverse Shue's convictions on Counts I, II, and III for the *Doyle* violation, we need only address whether Rule 8(a) permitted Count IV, the Norwood bank robbery, to be joined with the other counts. We first reject the government's contention that the conspiracy count (Count I) provided a sufficient connecting link to join Count IV with the other offenses. Although an indictment may join counts for illegal acts committed by defendants in furtherance of a single, ongoing conspiracy, *see United States v. Ras*, 713 F.2d 311, 315 (7th Cir.1983), the conspiracy count against Shue and Gesior did not list the Norwood bank robbery as part of the conspiracy. Moreover, the government did not argue to the jury that the Norwood robbery was part of the conspiracy. For these reasons the government cannot now contend that Count IV was properly joined as an act in furtherance of the conspiracy charged in Count I.

Nonetheless, Rule 8(a) may still permit joinder of Count IV if that offense is "of the same or similar character" as the other charged offenses. This language in Rule 8(a) permits joinder if the "counts refer to the same type of offenses occurring over a relatively short period of time, and the evidence as to each count overlaps." *Rodgers*, 732 F.2d at 629 (quoting *United States v. Shearer*, 606 F.2d 819, 820 (8th Cir.1979)). In *Rodgers*, the Eighth Circuit held that a lapse of twenty months between the crimes did not preclude joinder; however, the court stressed that the permissible time period varies with the similar-

ity of offenses and the possible overlapping of evidence. *Id.* Here the robbery of the Norwood bank (Count IV) occurred after the Colonial bank robbery and the Argo State Bank attempted robbery but before the Liberty and Suburban bank robberies. The Norwood bank robbery is clearly of the same character as the other robberies and the attempted robbery included in the indictment. In addition, much of the evidence about the other robberies would be admissible, with a proper limiting instruction, at a separate trial on Count IV. For example, the use of a fake grenade in the attempted robbery of the First Interstate Bank and Budrius's testimony that Shue proposed using a fake or unloaded gun in the Suburban bank robbery (included in Count I) tend to reveal a unique modus operandi consistent with the use of a toy gun in the Norwood robbery. *See* Fed.R. Evid. 404(b); *United States v. Shackleford*, 738 F.2d 776, 783 (7th Cir.1984). And the timing of the Norwood robbery (several days after Raduazzo named Shue as his accomplice in the Colonial robbery and the Argo State attempted robbery) might permit the government to offer evidence of those robberies and Raduazzo's statements to suggest a motive for Shue to rob the Norwood bank. *Shackleford*, 738 F.2d at 782.

The Norwood bank robbery occurred about fifteen months after the attempted robbery of the Argo State Bank and about eight months before the attempted robbery of the First Interstate Bank. In light of the high degree of similarity between the offenses and the potential overlap of evidence at separate trials, we think the other offenses were close enough in time to permit joinder under Rule 8(a). *See Rodgers*, 732 F.2d at 629–30.

 Of course, joinder can be proper yet prejudicial; thus Fed.R.Crim.P. 14 authorizes the district court to sever counts if a joint trial would be prejudicial to either the government or the defendant. *See United States v. Raineri*, 670 F.2d 702, 708–09 (7th Cir.), *cert. denied*, 459 U.S.

1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982). But a Rule 14 motion for severance is directed to the discretion of the district court, and we will reverse a defendant's conviction "only upon a showing of clear abuse of that discretion." *Hedman*, 630 F.2d at 1200. We do not think the district court abused its discretion in denying Shue's motion to sever the bank robbery counts. The court gave adequate limiting instructions to the jury and, as the acquittal on Count V demonstrates, the case was not so complex as to prevent the jury from separating and appraising the evidence as to each count. *Cf. id.*

■ Shue also argues that Fed.R. Crim.P. 16(a)(1)(D) required the government to disclose that an FBI photographic expert had used a magnifying glass to compare a photograph of Shue with a photograph of the Norwood bank robber. The comparison, which the expert had made the night before he testified, revealed that both Shue and the Norwood bank robber had an indentation under the lower lip, a protruding jaw, and a flap of skin between the jaw and neck. The government contends on appeal that it had no duty to disclose because the expert made no written report. Shue counters that even though the expert gave an oral report to the prosecutor, the prosecutor's failure to disclose the expert's conclusions violated Rule 16(a)(1)(D) and mandates reversal.

Rule 16(a)(1)(D) provides as follows:

Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

Although the phrase "any results or reports" does not exclude oral reports, the language "the government shall permit the defendant to *inspect and copy or photograph* " is identical to the language used in Rule 16(a)(1)(A) (written or recorded statements made by the defendant) and Rule 16(a)(1)(C) (documents and tangible objects). Thus the language of Rule 16(a)(1)(D) suggests that it refers only to written reports. *See United States v. Johnson*, 713 F.2d 654, 659 (11th Cir.1983) (Emergency Medical Technician expert could testify since no report was made), *cert. denied*, — U.S. ——, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). Here the defendant does not deny that he had access to both photographs; he contends that Rule 16 required the government to disclose the contents of oral statements made by the expert after comparing the photographs. We hold that, in these particular circumstances, Rule 16(a)(1)(D) does not require such disclosure.

■ We also reject the defendant's argument that the district court should have suppressed the toy guns found in a file cabinet in the basement Shue rented from Mr. and Mrs. George Wenta. In addition to Shue's and Gesior's belongings, the basement contained furniture and personal property of the Wentas and five of their friends. The basement also contained the Wentas' washer and dryer, so Mrs. Wenta went into the basement to do laundry even after Shue became a tenant. More importantly, although Mrs. Wenta told Shue that he could use the dresser, he never asked her if he could use the file cabinet, in which Mrs. Wenta had stored some toiletry bottles, bowling trophies, and a quilt. Thus Shue cannot analogize the search of the filing cabinet to the search in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1962), in which the apartment owner gave the defendant permission to use, and exclude others from, the premises. *Id.* at 265–67, 80 S.Ct. at 733–34; *Rakas v. Illinois*, 439 U.S. 128, 142–43, 149, 99 S.Ct. 421, 429–30, 33, 58 L.Ed.2d 387 (1978). Here, Carol Gesior, who shared the basement with Shue, and the Wentas, who let

the FBI agents into the basement, consented to the search. On the facts of this case, the district court properly held that Shue did not have a reasonable expectation of privacy in the filing cabinet.

■ Finally, Shue argues that the in-court identification technique was unreasonably suggestive. At trial, the government offered the testimony of two tellers who worked at a bank down the street from the Norwood Federal Savings and Loan. Each testified that on the day the Norwood bank was robbed she saw a man acting strangely in the lobby of their bank. For both witnesses, the prosecutor first handed the teller a photograph of a lineup and then asked her whether she had previously indicated that someone in the lineup resembled the person she had seen on the day of the Norwood robbery. One teller testified that she had previously told the FBI that two men in the photograph resembled the man she had seen, but the picture of Shue resembled the man more. She could not identify Shue in court. The other teller testified that she had stated to the FBI that the picture of Shue in the lineup most resembled the man she had seen; she admitted on cross-examination that when she identified Shue in court she meant that he was the man in the photograph.

This in-court identification technique was not unreasonably suggestive. Basically both tellers testified that in an out-of-court identification they had picked Shue's picture out of a photograph of a lineup. Since the defendant does not challenge the out-of-court identification, the testimony of the tellers about that identification does not violate due process. *See Manson v. Brathwaite*, 432 U.S. 98, 114–17, 97 S.Ct. 2243, 2253–54, 53 L.Ed.2d 140 (1976); *United States v. Flick*, 719 F.2d 246, 249 (7th Cir.1983), *cert. denied*, — U.S. ——, 104 S.Ct. 2178, 80 L.Ed.2d 560 (1984). The jury could consider that testimony for what it was worth. *See Manson*, 432 U.S. at 116.

For the foregoing reasons, the conviction and sentence on Count IV are affirmed. The convictions on Counts I, II, and III are

reversed and remanded for the new trial which they merit.